UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CRIMINAL ACTION NO. 1:20-CR-00011-GNS-1

UNITED STATES OF AMERICA                                                 PLAINTIFF

V.

ROBERT E. WINDHAM, II                                                     DEFENDANT

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND RECOMMENDATION

### BACKGROUND

This matter is before the Court on Defendant Robert E. Windham, II's motion to suppress evidence (DN 30). The United States filed a Response in opposition (DN 34). The motion was referred to the undersigned to conduct any necessary hearings and prepare a report and recommended disposition (DN 31).

On November 9, 2021, the undersigned conducted an evidentiary hearing (DN 51). Windham was present in person and represented by appointed counsel Donald J. Meier (Id.). The United States was represented by Assistant United States Attorney Mark J. Yurchisin, II (Id.). The transcript of the hearing was filed thereafter (DN 52). Pursuant to the undersigned's order, Windham (DN 57) and the United States (DN 56) filed post-hearing briefs.

### FINDINGS OF FACT

On July 15, 2020, Windham was indicted by a Grand Jury sitting in the Bowling Green division with a single count of possession of a firearm by a prohibited person under 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (DN 16). The indictment alleges that Windham has four prior felony

offense convictions and, on March 20, 2020, was found in possession of a Lorcin .380 caliber semiautomatic pistol (Id.). Police discovered the firearm during a search of a residence.

Windham seeks evidentiary suppression of the firearm (DN 30). As to the facts of the search which culminated in discovery of the firearm, the United States called three witnesses at the evidentiary hearing (Transcript of Hearing, DN 52, pp. 4-5, 37-38, 55) (hereinafter "TR"). These were Warren County Sheriff Department Deputies Seth Miciotto and Tim Robinson and Sergeant Jonathan Shackelford (Id.).

Deputy Miciotto testified that he received a call from police dispatch to respond to a "shots fired" report at an address on Upper Stone Avenue in Warren County (TR p. 5). The caller had reported hearing an argument next door, a gunshot, and the sound of a female crying (TR pp. 5-6). Miciotto was riding with a training officer, Deputy T.J. Burnett (TR p. 18), and they arrived on-scene approximately 7 minutes after receiving the call (TR p. 6). The address in question was a one-story duplex, sharing a common center wall (Id.). At the time he arrived, Miciotto believed that he was likely responding to a domestic conflict matter (TR pp. 14-17). Miciotto knocked on the door of the apartment adjacent to the caller's apartment and announced himself as law enforcement (TR pp. 6-7). Windham opened the door, came outside, and closed it behind him (TR p. 7). Miciotto described the act of shutting the door to be a "red flag" of suspicious activity (TR p. 8). Miciotto noted an odor of alcohol emanating from Windham, that his speech was slurred, and his eyes were bloodshot (Id.). Miciotto advised Windham the reason for his visit was a "shots fired" call, and Windham denied that there had been any gunshot (TR p. 7). Miciotto observed Windham exhibit other behavior he found suspicious (TR pp. 7-8). He stated Windham would hesitate before answering questions and did not give direct answers (TR p. 7). He also noted that Windham did not make eye-contact and turned away from him at an angle, which

Miciotto described as "deflecting" based on his law enforcement training (Id.). He conducted a check of Windham's record and learned that he had prior felony convictions (TR pp. 17, 29).

Miciotto knocked on the door again, and Bobbie Drury came to the door and likewise shut it behind her (TR p. 10). He noted that she had red eyes but could not be sure whether it was attributable to crying or simply the lateness of the hour (Id.). He did not note any signs of injury (TR p. 24). He spoke with her at a location separate from Windham (TR p. 12) He asked her about the report of a gunshot, and she initially denied that there had been any (Id.). She then stated that it was possible a gun had been fired in the back yard (TR p. 14). She was unable to tell him if anyone else was inside (TR p. 12, 36) and generally became uncooperative (TR p. 12). She denied permission to search the residence (Id.). Miciotto also learned that Drury had a prior felony conviction (TR p. 30). Miciotto could not recall if he conducted a protective pat-down search of either Windham or Drury at any time before the protective sweep[1] (TR p. 26).

---

1 During the evidentiary hearing, the witnesses referred to the preliminary search of the dwelling as both a "safety sweep" (TR pp. 13, 18, 36) and as a "protective sweep" (TR pp. 43, 45). A case decided before Maryland v. Buie, 494 U.S. 325, 327 (1990), suggests the terms are not synonymous:

> The term "safety sweep" is used to indicate a superficial sweep for concealed *persons*, conducted incident to the execution of a *warrant to search* the premises for evidence. A "safety sweep" differs fundamentally from a "protective sweep," by which is meant a premises *search* incident either to a warrantless *arrest* on probable cause, or to a warranted *arrest* of a person *other than the owner* of the premises, *see, e.g.*, Steagald v. United States, 451 U.S. 204, 68 L. Ed. 2d 38, 101 S. Ct. 1642 (1981); United States v. Curzi, 867 F.2d 36 (1st Cir. 1989), or to a *warrantless search* of the same premises. The distinction is important. A *search* warrant assures that a detached magistrate has found probable cause to *enter and search* at least some portion of the premises. A "protective sweep," on the other hand, is conducted incident to a *warrantless* search, or a *warrantless* arrest, or to the execution of a *warrant* for the *arrest* of a person *other than the owner* of the premises, none of which entails any determination by a *neutral magistrate* that there is probable cause *either to enter, or to search*, the premises *for any purpose*. *See* Steagald, 451 U.S. at 214 n.7.

United States v. Daoust, 728 F. Supp. 41, 51 n.10 (D. Maine 1989) (emphases in original). Cases decided since Buie, however, appear to use the terms interchangeably. *See e.g.* Griffen v. Sec'y, Dept. of Corr., No. 1:16-CV-32-MW-GRJ, 2019 U.S. Dist. LEXIS 34846, *30 (N.D. Fla. Feb. 7, 2019); United States v. Benavidez, No. 16-CR-1732-MCA, 2016 U.S. Dist. LEXIS 175373, *2 (D.N.M. Dec. 16, 2016): United States v. Wideman, No. 6:15-CR-390-KOB-SGC, 2016 U.S. Dist. LEXIS 63378, *10 (N.D. Ala. May 13, 2016).

Meanwhile, Deputy Robinson arrived on scene and interviewed the next-door 911 caller (TR p. 41). The neighbor reported hearing a loud argument through the common wall, then a gunshot, and the argument stopped (Id.). Thereafter, a female could be heard crying (Id.). The neighbor advised him that he was "absolutely sure that it was a gunshot and that it occurred within the structure" (Id.). Robinson knew the neighborhood was known for gunshots and fireworks, and the neighbor was confident that it was not fireworks or a gunshot from outside (TR p. 50). Robinson did not obtain information from the neighbor as to how many people apparently were involved in the argument or whether the argument was between a male and female or two females (TR p. 51). He also did not hear any sounds in the adjoining apartment after Windham and Drury were outside (TR p. 52).

Sergeant Shackelford heard the dispatch call and decided to respond as a backup unit (TR p. 56). When he arrived, the other officers briefed him on their witness interviews (TR pp. 57-58). He described the decision to conduct a protective sweep of the apartment as a "collaborative decision" among the officers (TR p. 58). He testified that they were "pretty confident that a gunshot had been fired, based on statements from the complainant or the caller, and we just wanted to make sure that there was nobody dying or injured inside that needed treatment" (Id.). Miciotto similarly testified that the purpose of the protective sweep was "to make sure there was no gunshot victims or a shooter inside the residence" (TR p. 13). Robinson testified that he believed a protective sweep was justified because of the divergent stories of the various witnesses (TR pp. 45-46).

The officers entered the residence approximately 20 to 25 minutes after initial arrival (TR p. 26). The sweep took approximately one minute (TR pp. 18, 47). Officers observed a jar containing marijuana on the living room floor (TR p. 28, 46) and gun oil and .380 ammunition in

4

plain view in the bedroom (TR p. 28). One deputy also observed ceiling debris on the kitchen floor and a bullet hole in the ceiling (TR pp. 28, 47). Both Windham and Drury were detained while the officers sought issuance of a search warrant (TR p. 32). Drury gave consent to search and told them the gun would be located on Windham's side of the bed (Id.). However, the officers elected to wait for the warrant (Id.). Once the warrant was procured, a search of the bedroom revealed the gun where Drury had described it, and the circumstances of the bedside tables supported that the gun was on the side of the bed Windham used (TR p. 33).

## CONCLUSIONS OF LAW

Windham contends that the warrantless protective sweep of the residence was a search conducted in violation of his rights under the Fourth Amendment. The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967). Evidence obtained in violation of a defendant's constitutional rights bars the use of that evidence against him at trial. Mapp v. Ohio, 367 U.S. 643, 655 (1961).

The United States argues that the warrantless protective sweep was justified under either of two exceptions to the constitutional mandate that a search be effected only upon issuance of a warrant. First, the United States contends that a protective sweep is authorized when it is quick and limited and done for the protection of the officers and others, upon the officer's reasonable

belief that the area may harbor a dangerous individual (DN 56 p. 3) (citing Maryland v. Buie, 494 U.S. 325, 327 (1990); United States v. Taylor, 248 F.3d 506, 513 (6th Cir. 2001)). Second, the United States argues that a warrantless search is justified by the emergency aid exception, which permits officers to enter a dwelling to render emergency assistance to an injured occupant, to protect an occupant from imminent injury and to ensure the officer's own safety, based on the officer's objectively reasonable belief that a person needs aid (Id. at pp. 3-4) (citing Lange v. California, 141 S. Ct. 2011, 2017 (2021); Michigan v. Fisher, 558 U.S. 45, 47 (2009)).

Applying these exceptions to the present case, the United States observes that the officers were responding to what appeared to them to be a domestic conflict, which they all testified can be a particularly dangerous situation (Id. at p. 4). Once on scene, their concerns were not allayed by either Windham, who exhibited suspicious behavior, or by Drury, who changed her story from denying any gunshot to expressing the possibility that a gun might have been fired in the back yard (Id. at pp. 4-5). Contrasting with these was the certitude of the calling neighbor that there had been a loud argument, a gunshot inside the apartment, and then the sound of a woman crying (Id. at p. 5). Upon consideration of all the circumstances confronting the officers, the United States contends that they had a reasonable basis to believe that either a dangerous individual might be inside, an injured person might be inside, or both, and a protective sweep was therefore justified.

Windham disputes that a sufficient basis existed for conducting a protective sweep for purposes of safety from a dangerous individual or for the safety of a potentially injured victim. Turning first to the issue of safety from a potentially dangerous individual, Windham contends that a protective sweep is only justified when it occurs adjunct to taking a person into custody (DN 57 p. 6) (citing Buie, 494 U.S. at 337). Windham notes that both he and Drury voluntarily exited the dwelling when requested to do so (Id. at p. 7). There was no testimony that at any time

did the officers find it necessary to conduct a search of their persons for a weapon, nor was there any indication that there was anyone else inside the dwelling that might pose a risk (Id. at p. 6). He notes that, had the officers felt it appropriate to arrest either of them, they were already outside and there would have been no need to enter the dwelling (Id. at pp. 6-7). Consequently, he argues there was no basis upon which they could have held a reasonable belief that a sweep was necessary for their own protection (Id. at p. 7).

Turning to the possibility that an injured person might be inside, Windham notes the "community caretaking" aspect of exigent circumstances only justifies a warrantless search when swift action is required to avoid a risk of serious injury (Id. at p. 8) (citing Taylor v. City of Saginaw, 922 F.3d 328, 335 (6th Cir. 2019)). He notes that the officers spent over 20 minutes speaking with witnesses before deciding to conduct the protective sweep (Id. at p. 9). During that time, they developed no new information giving rise to a greater suspicion that someone inside might be injured (Id.). This delay, he contends, demonstrates that there was no emergency justifying a warrantless search (Id. at p. 10).

Protective Sweep for Officer and Public Protection

"A protective sweep . . . occurs as an adjunct to the serious step of taking a person into custody for the purpose of prosecuting him for a crime." Buie, 494 U.S. at 333. It is "not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found. The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." Id. at 335-36. The search is only justified when the officer possesses a reasonable belief based on specific and articulable facts that the area harbors an individual posing a danger to those on the arrest scene. Id. at 337. A Buie protective sweep also extends to certain situations other than

effecting an arrest, but only so long as the officers are lawfully on the premises.[2] United States v. Holland, 522 Fed. Appx. 265, 275-76 (6th Cir. 2013). "A protective sweep can only be conducted incident to an authorized search or seizure, such as a lawful arrest or lawful home entry." United States v. King, 382 F. Supp. 3d 702, 706 (N.D. Ohio 2019).

Here, the officers requested permission to search the home and were denied. Although the officers understood a firearm had been discharged within the residence, there is no evidence that they conducted a protective pat-down of either Windham or Drury to determine if either had the firearm on their person. They remained immediately outside the apartment for over 20 minutes before deciding to enter and conduct the sweep. The officers had no information or evidence suggesting that a third person remained in the apartment. Neither Windham nor Drury were placed under arrest (or even formally detained) prior to the search. To the extent they were suspects, both were outside. In sum, the officers lacked a reasonable suspicion that there was an individual located in the apartment who posed a danger to them as they conducted their investigation outside, and they did not lawfully enter the apartment when they conducted the sweep.

Exigent Circumstances Constituting a Warrant Exception

The United States argues that the protective sweep was justified by the exigent circumstance that a shooting victim might be located inside the apartment who urgently needed medical treatment.

> "A police officer's entry into a home without a warrant is presumptively unconstitutional under the Fourth Amendment. Warrantless entries are permitted, however, where 'exigent circumstances' exist." Ewolski v. City of Brunswick, 287 F.3d 492, 501 (6th Cir. 2002). "One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or

---

2   The permissible scope of a protective sweep has been extended in limited circumstances. An officer left behind to secure premises while a search warrant is obtained may conduct a protective sweep for his or her own safety. United States v. Taylor, 248 F.3d 506, 513 (6th Cir. 2001)). Nonetheless, the officer must be lawfully on the premises. United States v. Gillespie, No. 10-20736, 2011 U.S. Dist. LEXIS 71473, *14 (E.D. Mich. Jul. 1, 2011).

> threatened with such injury." Brigham City, Utah v. Stuart, 547 U.S. 398, 403, 126 S. Ct. 1943, 164 L. Ed. 2d 650 (2006) (citing Mincey v. Arizona, 437 U.S. 385, 392, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978)). To satisfy the exigent circumstances exception, the government "must show that there was a risk of serious injury posed to the officers or others that required swift action." United States v. Huffman, 461 F.3d 777, 783 (6th Cir. 2006). "This 'emergency aid exception' does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises. It requires only 'an objectively reasonable basis for believing,' that 'a person within the house is in need of immediate aid.'" Michigan v. Fisher, 558 U.S. 45, 47, 130 S. Ct. 546, 175 L. Ed. 2d 410 (2009) (quoting Brigham City, 547 U.S. at 404-06 and Mincey, 437 U.S. at 392).

United States v. Martin, No. 5:17-134-DCR, 2018 U.S. Dist. LEXIS 29620, *6 (E.D. Ky. Feb. 22, 2018). When considering whether such exigent circumstances are present, the Court considers the "totality of the circumstances and the inherent necessities of the situation at the time." United States v. Huffman, 461 F.3d 777, 783 (6th Cir. 2006). Police may seize evidence of illegal activity observed in plain view during an exigent circumstances search. United States v. Molina, No. 5:20-CR-128-DCR-MAS-1, 2021 U.S. Dist. LEXIS 160049, *13-14 (E.D. Ky. June 18, 2021) (citing Mincey, 437 U.S. at 393).

The United States points to the following factors supporting the existence of an exigent circumstance:

1. Windham's behavior during questioning was suspicious. He closed the front door behind him. He denied a gun was fired or that one was inside the apartment. He smelled of alcohol. He was evasive in answering questions, would not make eye contact and assumed a "deflecting" posture.

2. Police knew Windham was a convicted felon.

3. Drury's behavior during questioning was suspicious. She also closed the front door behind herself. She initially denied a gun had been fired, but then stated one might

9

   have been fired outside  She was not cooperative and stated she did not know if anyone else was in the apartment.  Her eyes were red, possibly because of the late hour or because she had been crying.

4. The neighbors who reported the gunshot heard a loud argument, a gunshot and a woman crying.  They were positive that the gunshot had been in the interior of the adjoining apartment.

5. The matter appeared to be a domestic dispute, in which there is a heightened risk of danger.

Windham counters with the following facts which he asserts demonstrate that there were no exigent circumstances justifying a warrantless search of the apartment:

1. Notwithstanding the neighbors' certainty that the gunshot had been inside the adjoining apartment, the neighborhood was well known for the sound of gunshots and fireworks.

2. The officers spent nearly a half-hour talking to Windham, Drury, and the neighbors before deciding that an emergency existed.  During this time, they learned no more than what they knew from the original 911 call.

3. No sounds were heard coming from inside the apartment, nor was there any indication that anyone else remained inside.

4. Neither Windham nor Drury showed any sign of injury.

5. Windham and Drury came outside to voluntarily speak with the officers.  Both denied any altercation had taken place.

Turning first to the issue of the 20 to 25 minute delay between the officers' arrival at the apartment and the decision that an exigent circumstance necessitated a warrantless search for a

10

possible injured victim, taking time for a reasonable investigation into the situation facing the officers does not obviate the existence of an emergency. United States v. Najar, 451 F.3d 710, 719 (6th Cir. 2006). Here, three witnesses were interviewed by two officers, who then conferred with their commanding officer as to what action should be taken. 20 to 25 minutes would not appear to be an excessive period of time in which to make the determination.

Did the officers have an objectively reasonable basis for believing that a person within the apartment was in need of immediate aid? They had credible information that there had been an argument in the apartment, followed by a gunshot. The arguing ceased and a woman could be heard crying. Although Windham and Drury denied a gunshot, their stories were inconsistent. Both exhibited behavior which caused the officers to doubt their honesty.

In United States v. Holloway, 290 F.3d 1331, 1338 (11th Cir. 2002), the Court found exigent circumstances to exist for a warrantless search where a 911 call reported gunshots and upon arrival "nothing at the [residence] dissuaded the officers from believing the veracity of the 911 calls." As such, a warrantless search was justified due to the "possibility of a gunshot victim lying prostrate in the dwelling . . . ." Id. In Causey v. City of Bay City, 442 F.3d 524 (6th Cir. 2006), where officers responded to a shots fired 911 call, the Court observed that "although the officers might have inferred that an exigency did not exist from the plaintiffs' assurances that no one was injured, it was nevertheless 'equally plausible but not unreasonable,' for the officers to infer that either (1) the plaintiffs were concealing another person (perhaps incapacitated by the gunshots) inside the house or (2) the plaintiffs were being intimidated to give assurances by an unseen attacker in the residence." Id. at 530 (quoting Dickerson v. McClellan, 101 F.3d 1151, 1160 (6th Cir. 1996)). Given the totality of the circumstances in this case (credible witness statement of argument, gunfire and afterward a female crying, and less credibility on the parts of

Windham and Drury), the officers had an objectively reasonable basis to believe that an injured victim might be inside who required medical assistance. The protective sweep was brief, limited, and justified under the circumstances.

## RECOMMENDATION

Based upon the aforementioned reasons, the undersigned **RECOMMENDS** that Windham's motion to suppress (DN 30) be **DENIED**.

December 29, 2021

H. Brent Brennenstuhl
United States Magistrate Judge

## NOTICE

Under the provisions of 28 U.S.C. § 636(b)(1)(B) and FED. R. CRIM. P. 59(b)(1), the Magistrate Judge files these findings and recommendations with the Court and a copy shall forthwith be electronically transmitted or mailed to all parties. Within fourteen (14) days after being served with a copy, any party may serve and file written objections to such findings and recommendations as provided by the Court. FED. R. CRIM. P. 59(b)(2). "Failure to object in accordance with this rule waives a party's right to review." FED. R. CRIM. P. 59(b)(2).

December 29, 2021

H. Brent Brennenstuhl
United States Magistrate Judge

Copies:     Counsel of Record